UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-224 (PJS/LIB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JULIUS FINEDAY,<br><br>Defendant. | ) | DEFENDANT'S POSITION ON SENTENCING |

Defendant Julius Fineday is before the Court as a result of the tragic death of his seven-year-old daughter JF. Mr. Fineday has accepted full responsibility for JF's death, having pleaded guilty to second-degree manslaughter by child neglect in violation of 18 U.S.C. § 1153 and Minn. Stat. § 609.205. Because there is no sentencing guideline applicable to these statutes, this Court must determine the most analogous guideline pursuant to U.S.S.G. § 2X5.1. For the reasons stated below, the federal crime most analogous to Minnesota second-degree manslaughter, an offense that may be committed by a *mens rea* of criminal negligence, is involuntary manslaughter. Applying U.S.S.G. § 2A1.4, the applicable guideline range is 10-16 months.

This offense was a tragedy for Mr. Fineday and for his entire family. Julius loved JF, as he loved all his children. JF died as a result of poverty, neglect, and a family overwhelmed by the burden of caring for ten minor children. Mr. Fineday has lost custody of his children as a result of this offense. Had Indian Family and Children Services intervened sooner, JF would still be alive. A sentence of a year

and a day is sufficient but not greater than necessary to achieve the purposes of sentencing.

FACTS

On December 25, 2022, JF, Julius Fineday's seven-year-old daughter, died. An autopsy following her death determined the cause of death to be malnutrition and an invasive Streptococcus infection. PSR ¶ 15. There were no signs of physical or sexual abuse.

Tessa Jones is the mother of Julius's five children. In 2020, Julius and Tessa terminated their relationship. Although initially following the breakup, Ms. Jones assisted in the care of the children, Julius discovered that Tessa had left the children with a babysitter and disappeared. Julius has had physical custody and sole caretaking responsibility for his five children since then, and Tessa has provided no assistance with childcare or financial support.

In 2021, Julius Fineday and his five children moved into a home shared by Julius's parents, Phillip Fineday and Sharon Rosebear. The home they shared is in Ponemah, Minnesota, on the Red Lake Indian Reservation. In addition to Julius and his five children, the home was also occupied by the five minor children of Julius's brother, Derrick Rosebear. ¶ 6. Thus, for the entire year of 2022, the household contained at least three adults—Julius and his parents—and ten children under the age of 18—Julius's five children, and Derrick's five children. From time to time during 2022, Derrick Rosebear also lived in the house with

Selena Kingbird, the mother of their five children. In December 2022, Julius Fineday's five children ranged in age from 5 to 12.

The three adults and ten children were living in abject poverty. Over time the home had deteriorated to the point that by 2021, it was no longer fit for human habitation. From at least 2021 and continuing through 2022, the home had no running water, heat, or indoor plumbing. For water, the household used an outdoor hose (until that froze over in the winter) or gallons of water purchased from the store. For sanitation, the household used a bucket and garbage bags. For heat, the household relied on an electric oven in the kitchen, space heaters, and blankets. The walls had open holes with insulation hanging out, and the house was infested with mice and cockroaches. Julius Fineday and his five children slept on dirty mattresses strewn across the floor in the living room. ¶ 10.

Julius Fineday found his parental responsibilities for his five young children overwhelming. Throughout 2022, he struggled with mental health challenges, including anxiety and depression. ¶ 44. He often relied on his parents, Sharon Rosebear and Philip Fineday, to help him in feeding and caring for his children.

In 2022, many of the children within the home experienced severe and prolonged headlice infestations, particularly the girls with longer hair. Reports were made to Red Lake Family and Child Services (FCS) in October 2022 and again on December 6, 2022, raising concerns regarding potential neglect. The December 6 report was prompted by one of Julius's sons being observed at school with a severe lice infestation that had so badly infected his scalp that it smelled of rot. The child

was transported to the hospital by ambulance and a neglect report was made. Following both reports, FCS conducted welfare checks of the home, and although they observed the family's living conditions, they did not make any repairs to the home, provide additional resources for the children, or report any concerns about JF's welfare.

Julius found it difficult to address JF's lice because she kicked and screamed if he tried to wash her hair and would not allow him to cut her hair. JF did not attend school because of her lice and because she did not like leaving the house.

For several days before she died, JF had what Julius believed to be a cold or the flu. She was lethargic and weak and had a cough. She had difficulty walking. ¶ 12. Julius treated her with Ibuprofen but had no idea JF's condition was life threatening. At the time of her death, Minor A's hair was matted and covered in lice.

As he has admitted, Julius was negligent for failing to take JF to the doctor in the days and months leading up to her death for her lice infestation and for her malnutrition. Julius tried to provide food for JF and her siblings, and he did not realize she was dangerously malnourished. He was not concerned about JF's health and welfare because it seemed to him that none of the other adults in the home were concerned about JF's health and welfare. His brother Derek and Selena Kingbird were staying in the home in the days leading up to JF's death, and neither of them expressed any concern about JF. Similarly, his parents never expressed concern about JF.

DISCUSSION

## I. The involuntary manslaughter guideline is most analogous to Minnesota child neglect manslaughter under U.S.S.G. § 2X5.1

The Major Crimes Act, 18 U.S.C. § 1153, authorizes the government to prosecute Native Americans for a limited number of enumerated crimes committed in Indian Country. *See Keeble v. United States*, 412 U.S. 205, 206 (1973). As relevant here, the Act authorizes prosecution of "manslaughter" and "felony child . . . neglect." 18 U.S.C. § 1153(a).

Under the authority of the Major Crimes Act, Mr. Fineday is charged with a violation of Minn. Stat. § 609.205, "Manslaughter in the Second Degree." That statute makes it a crime to "cause[] the death of another by any of the following means," including "by committing or attempting to commit a violation of section 609.378 (neglect or endangerment of a child)." *Id.* at subd. 5.

The child neglect statute, in turn, makes it a crime for a parent "who willfully deprives a child of necessary food, clothing, shelter, health care, or supervision appropriate to the child's age, when the parent, guardian, or caretaker is reasonably able to make the necessary provisions and the deprivation harms . . . the child's physical . . . health." Minn. Stat. § 609.378, subd. 1. The crime is a gross misdemeanor, subject to a maximum penalty of 364 days unless substantial harm to the child results.

There is no sentencing guideline applicable to child neglect manslaughter. Instead, the Court is required to find the most analogous guideline pursuant to U.S.S.G. § 2X5.1. *See* U.S.S.G. § 1B1.2(a) ("For statutory provisions not listed in the

Statutory Index, use the most analogous guideline. See § 2X5.1 (Other Offenses).")

That guideline states as follows:

> If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter Two offense guideline shall remain applicable.

U.S.S.G. § 2X5.1.

In a background note, the Sentencing Commission explained:

> Many offenses, especially assimilative crimes, are not listed in the Statutory Index or in any of the lists of Statutory Provisions that follow each offense guideline. Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offenses proscribe. The court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous. In a case in which there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 control.

U.S.S.G. § 2X5.1 comment. (backg'd).

Thus, the Sentencing Commission made clear that § 2X5.1 applies to "assimilative crimes," that is, state crimes charged as predicate offenses under the Major Crimes Act, 18, U.S.C. § 1153, or Assimilated Crimes Act, 18 U.S.C. § 13. In addition, the Sentencing Commission anticipated that even with respect to these state crimes to which no federal sentencing guideline explicitly applies, in most cases there will be an analogous guideline because the guidelines "cover the type of criminal behavior that most such offenses proscribe," § 2X5.1 comment. (backg'd). *See United States v. Jackson*, 862 F.3d 365, 376 (3d Cir. 2017) ("The Sentencing Commission thereby contemplates that most assimilated offenses will actually have

a 'sufficiently analogous' offense guideline.").

This case is no exception.

### A. U.S.S.G. § 2X5.1 requires a two-step analysis beginning with a comparison of the elements of the charged offense and the analogous federal offense.

The Eighth Circuit has adopted a two-step process to determine the applicable guideline under § 2X5.1. In *United States v. Osborne*, 164 F.3d 434 (8th Cir. 1999), the Court considered which guideline was most analogous to the South Dakota offense of vehicular battery, which criminalizes drunk driving resulting in serious bodily injury to another person. *Id.* at 436, n. 2. Applying § 2X5.1, the district court found that the involuntary manslaughter and aggravated assault guidelines "were almost equally analogous, except that death did not occur in this case." 164 F.3d at 436. Ultimately, the court applied the aggravated assault guideline as the most analogous guideline. *Id.* The Eighth Circuit affirmed.

Relying on the Background note quoted above, which asks if there is a "sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous," the Eighth Circuit adopted a two-step analysis. In the first step, the sentencing judge must determine whether any of the guidelines are "sufficiently analogous to the defendant's crime." *Id.* at 437. That analysis depends on a comparison of the elements of any analogous federal crimes with the elements of the crime of conviction. *Id. See United States v. Allard*, 164 F.3d 1146, 1149 (8th Cir. 1999) ("determining whether there is a sufficiently analogous guideline to a particular crime is generally a task of comparing the elements of federal offenses to

the elements of the crime of conviction"); *United States v. Jackson*, 862 F.3d 365, 373 (3d Cir. 2017) (adopting *Osborne* elements test); *United States v. Nichols*, 169 F.3d 1255, 1270 (10th Cir. 1999) (same). That is a legal question subject to de novo review on appeal. *Osborne*, 164 F.3d at 437.

If there is more than one sufficiently analogous offense guideline, in the second step, the court must determine which is "most analogous." *Id*. This inquiry requires the court to consider all the circumstances of the case and make factual findings to support its conclusion of the most analogous guideline. *Id.* at 438. This factual inquiry is reviewed on appeal with due deference to the lower court's conclusions. *Id.* at 437-38. *See United States v. Montanez*, 36 F.4th 824, 825-27 (8th Cir. 2022) (applying *Osborne* two-step analysis to choose between two sufficiently analogous guidelines).

In a companion case to *Osborne*, the Eighth Circuit agreed that the involuntary manslaughter guideline was also "sufficiently analogous" to vehicular battery and in appropriate circumstances, could be the "most analogous" guideline, even though death did not result. In *United States v. Allard*, 164 F.3d 1146 (8th Cir. 1999), the same panel of the Eighth Circuit considered another vehicular battery case sentenced by the same district court judge. *Id.* at 1148. As in *Osborne*, the district court determined that both involuntary manslaughter and aggravated assault were sufficiently analogous to the offense of conviction, but in *Allard* determined the involuntary manslaughter guideline was most applicable. *Id.* at 1147. Reflecting the due deference afforded the district court in determining which

of several sufficiently analogous guidelines is most analogous, the Eighth Circuit held the district court's choice was not clearly erroneous in either case. *Id.* at 1148.

The *Allard* Court agreed that involuntary manslaughter was sufficiently analogous to vehicular battery, noting that neither offense requires specific intent to cause harm. *Id.* at 1149. Moreover, both offenses require that the defendant's conduct cause serious bodily harm. *Id.* Although involuntary manslaughter requires the death of the victim, while vehicular battery requires only serious bodily harm, the Court rejected the suggestion "that the difference between death and serious bodily injury makes involuntary manslaughter insufficiently analogous to vehicular battery." *Allard*, 164 F.3d at 1149.

### B. Involuntary manslaughter is sufficiently analogous to Minnesota child neglect manslaughter

*Allard* and *Osborne* pave the way here. Comparing the elements of second-degree manslaughter by child neglect to those of involuntary manslaughter under 18 U.S.C. § 1112 leaves no doubt that the latter offense is sufficiently analogous to the former. Although there are elements of Minnesota second-degree manslaughter by child neglect that are not required for involuntary manslaughter, child neglect manslaughter is simply a specific factual example of involuntary manslaughter.

The elements of child neglect manslaughter are:

1. The defendant caused the death of another;
2. By committing an act of child neglect in violation of Minn. Stat. §609.378.

Minn. Stat. § 609.205(5). *See State v. Meeks*, No. A10-767, 2011 WL 1743748 *2-3 (Minn. Ct. App. May 9, 2011) (setting out elements of Minn. Stat. § 609.205(5).

The elements of criminal child neglect under Minn. Stat. § 609.378, subd. 1(a)(1) are that a parent willfully deprived a child of necessary food or healthcare, and that the deprivation harmed the child's health. *See State v. Ring*, No. C4-01-1151, 2002 WL 523164 *5 (Minn. Ct. App. Apr. 9, 2002); 10 Minn. Prac., Jury Instr. Guides--Criminal CRIMJIG 14.07 (7th ed. 2023). In other words, child neglect manslaughter occurs when a parent causes the death of a child by depriving her of necessary care.

Although the child neglect statute requires that the parent willfully deprive a child of necessary care, the parent need not intend to harm the child or even realize that harm is likely to occur. "The child-neglect statute criminalizes negligence." *State v. Cyrette*, 636 N.W.2d 343, 348 (Minn. App. 2001). *See State v. Bonacci-Koski*, No. A19-0125, 2020 WL 614327 *5 (Minn. Ct. App. Feb. 10, 2020) (*quoting Cyrette*); *State v. Steckelberg*, A10-2112, at *5 (Minn. Ct. App. Sep. 6, 2011) ("A parent may be guilty of neglect of a child even if the parent did not intend to cause harm to a child.").

Involuntary manslaughter under 18 U.S.C. § 1112 requires proof of the following elements:

1. The defendant caused the death of another;
2. The defendant did so in the commission of an unlawful act not amounting to a felony or a lawful act which might produce death when

done in an unlawful manner or without due caution and circumspection;

3. The defendant acted grossly negligently.

*See* Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit 6.18.1112b (2023 ed.).

Both second-degree manslaughter by child neglect and involuntary manslaughter are defined as manslaughter. Both require the death of another caused by the criminal negligence of the defendant. Neither requires the defendant to have acted with malice or to have intended the victim's death or harm. *See Allard*, 164 F.3d at 1149. Although child neglect manslaughter is a particular species of manslaughter, there is no question Mr. Fineday could have been prosecuted for the alleged offense conduct under 18 U.S.C. § 1112. The government alleges that he caused the death of his daughter by the commission of an unlawful act not amounting to a felony (child neglect under Minn. Stat. § 609.382, subd. 1(a)(1)), or that he committed a lawful act (childcare) without due caution and introspection.

There is a far stronger analogy between child neglect manslaughter and involuntary manslaughter than between vehicular battery and involuntary manslaughter, a statutory analogy affirmed by the Eighth Circuit in *Allard*.

Although there is not complete agreement between the elements of these two crimes, involuntary manslaughter "cover[s] the type of criminal behavior that [child neglect manslaughter] proscribe[s]," just as the Sentencing Commission

contemplated in § 2X5.1.

Moreover, the Eighth Circuit and its sister circuits agree that to be sufficiently analogous for purposes of § 2X5.1, the elements of the federal crime need not match the assimilated crime exactly. As the Eighth Circuit has cautioned, fitting a state assimilated crime into the federal guidelines "is frequently similar to attempting to determine which round hole best accommodates a square peg." *Allard*, 164 F.3d at 150. *See id.* at 1149 ("[B]y definition, analogous guidelines do not and need not perfectly match the defendant's crime."); *Osborne*, 164 F.3d at 440.

Thus, the elements comparison must be done "in a flexible and open-ended fashion." *United States v. Jackson*, 862 F.3d 365, 375 (3d Cir. 2017). After all, the question is not whether there is a guideline identical to the assimilated crime, only whether there is a guideline "sufficiently analogous" to the "type of criminal behavior" charged. U.S.S.G. § 2X5.1 and comment. (backg'd.). "'[A]nalogy does not mean identity. It implies difference.'" *Jackson,* 862 F.3d at 376 (*quoting United States v. Langley*, 919 F.2d 926, 930-31 (5th Cir. 1990) (*quoting Sturm v. Ulrich*, 10 F.2d 9, 11 (8th Cir. 1925)). For that reason, in comparing the elements of the charged crime and the potentially analogous guidelines, all that is required is the guidelines be in the right "ballpark" and be "plausible analogies." *United States v. Rakes*, 510 F.3d 1280, 1287, 1288 (10th Cir. 2007) (*overruled on other grounds*, *United States v. Neilson*, 721 F.3d 1185, 1187 n. 1 (10th Cir. 2013)). *See also United States v. Finley*, 531 F.3d 288, 291-92 (4th Cir. 2008) (holding sentencing judge must apply most analogous guideline if "an assimilated state offense resembles

conduct for which a sentencing guideline for a federal offense has been promulgated").

It should not be surprising that the elements of the analogous federal crimes would not be a perfect match for the state crimes. After all, assimilated state crimes are only subject to federal prosecution to the extent there is no exact federal match, otherwise they would not be assimilated at all. *See Jackson*, 862 F.3d at 376 (noting that "assimilated crimes, by definition, have no perfect matches among federal offenses") (citation omitted). For that reason, "it is only to be expected that the offense of conviction may include more expansive elements than the federal offense or additional elements missing from the federal counterpart." *Id.* at 382.

If § 2X5.1 required complete synchrony of elements, no guideline would be found to be "sufficiently analogous." Yet, as noted above, the Sentencing Commission plainly anticipated that most assimilated crimes would have sufficiently analogous guidelines because they cover "the same type of criminal behavior." U.S.S.G. § 2X5.1 comment. (backg'd.).

In keeping with that directive, the courts have found that the involuntary manslaughter guideline is the most analogous guideline for a wide range of offense conduct in which criminally negligent conduct causes death or serious injury, even though the specific elements of the crime do not completely correspond. *See, e.g., Allard*, 164 F.3d at 1149 (holding involuntary manslaughter sufficiently analogous to vehicular battery); *United States v. Fortier*, 180 F.3d 1217, 1228-30 (10th Cir. 1999) (applying involuntary manslaughter guideline to conviction for transportation

and sale of stolen firearms, the proceeds of which funded the Oklahoma City bombing, even though "not a perfect fit"); *United States* v. *Key*, 599 F.3d 469, 471 (5th Cir. 2010) (applying involuntary manslaughter guideline to assimilated crime of Texas Intoxication Manslaughter); *United States v. Alvarez*, 809 Fed. Appx. 562 (11th Cir. 2020) (applying involuntary manslaughter guideline to conviction under Seaman's Manslaughter Statute where unlicensed charter boat captain ran over passenger in water).

*United States v. Clark*, 981 F.3d 1154 (10th Cir. 2020), which considered what guideline applied to an assimilated Oklahoma child neglect statute, is distinguishable. In *Clark*, the defendant, an enrolled member of the Cherokee Nation, failed to obtain medical care for her nine-year-old child who died after injuring her leg while playing. The district court held that there was no analogous sentencing guideline for Oklahoma child neglect, and the Tenth Circuit affirmed.

Applying the elements test, the court first compared the elements of Oklahoma child neglect with the elements of federal statutes to determine whether any sentencing guideline was sufficiently analogous to—that is, in the ballpark of—the offense of conviction. *Id.* at 1162-63 & n. 2. The court held that involuntary manslaughter was not sufficiently analogous to Oklahoma child neglect because involuntary manslaughter, unlike Oklahoma child neglect, requires the death of a person. The Oklahoma statute, by contrast, does not require any injury to the child. *Id.* at 1164. Moreover, the child neglect statute, the court said, does not require that the defendant commit an unlawful act not amounting to a felony or any of the other

ways in which involuntary manslaughter may be committed. *Id.* For those reasons, the involuntary manslaughter guideline was not sufficiently analogous to child neglect in violation of the Oklahoma statute.

The reasoning of the *Clark* court is inapplicable here. Unlike the Oklahoma child neglect statute, the Minnesota second-degree manslaughter by child neglect statute, like federal involuntary manslaughter, does require the death of a person. And it requires that the defendant commit an unlawful act not amounting to a felony—namely child neglect under Minn. Stat. § 609.378, subd. 1(a)(1).[1]

As the *Clark* court noted, had the court compared the *facts* of the offense to the elements of involuntary manslaughter, "we might conclude that involuntary manslaughter is a sufficiently analogous offense." *United States v. Clark*, 981 F.3d 1154, 1164 (10th Cir. 2020). The Oklahoma child neglect statute, however, did not require that those facts be present. Just the opposite is true here. The Minnesota child neglect manslaughter statute requires proof of the very facts which, as the *Clark* court acknowledged, makes this offense sufficiently analogous to involuntary manslaughter.

### C. No other guidelines are sufficiently analogous

Other than involuntary manslaughter, no other guideline is sufficiently

[1] Even if the child neglect is treated as a felony because it resulted in "substantial harm" to the child, *see* Minn. Stat. 609.378, subd. 1(a)(1), involuntary manslaughter would still be sufficiently analogous even though "not a perfect fit." *See Fortier*, 180 F.3d at 1228-30 (holding involuntary manslaughter was sufficiently analogous to sale of stolen firearms even though that offense was "*an unlawful act constituting a felony,*" contrary to the requirements of involuntary manslaughter).

analogous to Minnesota Second-Degree Manslaughter by Child Neglect. Thus, involuntary manslaughter is not only sufficiently analogous to the offense of conviction, it is also the most analogous guideline to the offense of conviction.

First, although 18 U.S.C. § 1112 creates crimes for both voluntary and involuntary manslaughter, voluntary manslaughter is not sufficiently analogous to child neglect manslaughter. The statute defines voluntary manslaughter as the unlawful killing of another "[u]pon a sudden quarrel or heat of passion." § 1112(a). It requires proof that the defendant acted with "'a general intent to kill, intent to do serious bodily injury, or with depraved heart recklessness.'" *Brewer v. United States*, 89 F.4th 1091, 1092 (8th Cir. 2024) (*quoting McCoy v. United States*, 960 F.3d 487, 489 (8th Cir. 2020)). *See United States v. Fortier*, 180 F.3d 1217, 1228 (10th Cir. 1999) ("Voluntary manslaughter . . . consists of an intentional homicide committed under extenuating circumstances . . . [such as where] the defendant . . . was in a state of passion engendered in him by an adequate provocation. . . .") (citation omitted).

The Eighth Circuit has held that voluntary manslaughter requires the use of force against the person of another and, as a result, is a crime of violence. *Brewer*, 89 F.4th at 1093. By contrast, as noted above, a parent can be guilty of child neglect manslaughter without any use of force, and without intending any injury to the child at all. In addition, no provocation is required for child neglect manslaughter. *See Fortier*, 180 F.3d at 1228 ("Voluntary manslaughter is inapposite because neither the victims' deaths nor the defendant's actions evolved from a sudden

quarrel or in the heat of passion.").

Assault offenses are similarly inapposite. The Eighth Circuit has defined assault as requiring either an "attempted battery, that is, an intended effort to cause bodily harm to another which falls short of success," or "an act which is intended to, and reasonably does, cause the victim to *fear* immediate bodily harm." *United States v. Olson*, 646 F.3d 569, 573-74 (8th Cir. 2011) (*quoting United States v. Lee*, 199 F.3d 16, 18 (1st Cir. 1999)) (emphasis in *Lee*). *See also* Manual of Model Criminal Jury Instruction for the District Courts of the Eighth Circuit 6.18.113(7) (2023 ed.) (defining "assault" as an "intentional and voluntary attempt or threat to injure another person, combined with the apparent present ability to do so, which is sufficient to put the other person in fear of immediate bodily harm or any intentional and voluntary harmful and offensive touching of another person without justification or excuse").

Child neglect manslaughter is a crime of omission. It does not require any assaultive conduct, or any affirmative act at all. It does not require an intent to injure another person or to cause that person to suffer fear. *See Clark*, 981 F.3d at 1167 (noting that Oklahoma child neglect statute, unlike federal assault statutes, did not require that defendant "intended to inflict harm or suffering on her daughter"). There is no way to analogize a *failure to act* with the sort of intentional conduct that could constitute an assault. As the *Clark* court explained,

> the offense of child neglect does not require an affirmative act on the part of the defendant, but rather only willful or malicious neglect, i.e., the failure to provide or the omission of certain essential basics of living that are necessary to a child's well-being. In contrast, the federal

> crime of assault requires the defendant to have either attempted to batter the victim or to have placed the victim in reasonable apprehension of immediate bodily harm.

*Clark*, 981 F.3d at 1165-66. Thus, the two offenses are not even "remotely analogous." *Id. See also Jackson*, 862 F.3d at 409 (dissenting opinion)[2] (noting that "the federal assault statute does not proscribe crimes of neglect, like the failure of a child's caregiver to provide proper meals, schooling, medical attention, or clothing," although they are essential to child neglect. "No definition of assault, no matter how expansive, includes such elements.").

The only federal offense that is sufficiently analogous to Minnesota second-degree manslaughter by child neglect is involuntary manslaughter. Although child neglect manslaughter is more specific than the more general federal statute, child neglect manslaughter could be prosecuted as involuntary manslaughter. Plainly, involuntary manslaughter covers "the type of criminal behavior" proscribed by the Minnesota statute. U.S.S.G. § 2X5.1, comment. (backg'd.). No other guideline is sufficiently analogous to this offense of omission resulting in death.

## II. Mr. Fineday's Offense Conduct Was Negligent, Not Reckless

U.S.S.G. § 2A1.4 provides for a base offense level of 12 "if the offense involved criminally negligent conduct," or 18 "if the offense involved reckless conduct." Mr.

---

[2] The *Jackson* majority held that simple assault was the most analogous guideline to the egregious child neglect in that case because the offense conduct included assaultive behavior. 862 F.3d at 387 ("a jury finding that a defendant exceeded his or her parental rights by, for example, inflicting unnecessarily severe corporal punishment constituted an implicit finding that defendant thereby committed simple assault"). There is no claim of assaultive conduct here, nor is that an element of the Minnesota child neglect manslaughter statute.

Fineday's conduct was negligent, resulting in a base offense level of 12, as set out in the Petition to Plead Guilty. Doc. No. 124 at ¶ 5.

The Sentencing Commission explained that "'criminally negligent' means conduct that involves a gross deviation from the standard of care that a reasonable person would exercise under the circumstances, but which is not reckless." § 2A1.4 comment. n. 1.

"'Reckless' means a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *Id.*

The Sentencing Commission noted that most involuntary manslaughter convictions under 18 U.S.C. § 1112 are reckless, while negligent offenses are "usually . . . assimilative crimes." *Id.*

Mr. Fineday pleaded guilty to an assimilative crime under Minnesota law. As noted above, a conviction for second-degree manslaughter by child neglect requires only that the defendant act negligently to deprive a child of necessary care and that negligence result in the death of the child. *See State v. Cyrette*, 636 N.W.2d 343, 348 (Minn. App. 2001) ("The child-neglect statute criminalizes negligence."); *State v. Bonacci-Koski*, No. A19-0125, 2020 WL 614327 *5 (Minn. Ct. App. Feb. 10, 2020) (*quoting Cyrette*); *State v. Steckelberg*, A10-2112, at *5 (Minn. Ct. App. Sep. 6, 2011) ("A parent may be guilty of neglect of a child even if the parent did not intend to cause harm to a child.").

Here, neither Julius Fineday nor any other adult in the household realized or understood that JF or any of the other nine children in the house was at risk of death. His crime was not in ignoring a risk of which he was aware, it was in failing to perceive a risk that existed. That is the definition of negligence.

Although Julius saw that JF was weak and sick for a few days before she died, neither he, nor Derrick Rosebear or Selena Kingbird, who were present in the home, recognized her illness as life-threatening. Julius treated her with Ibuprofen, and she stayed in bed.

In the past, when JF had presented with similar symptoms, it was never serious. For example, in 2019, Julius brought JF to the doctor when she had a fever and a cough, as well as lice, sores on her scalp, and impetigo. She was treated with Ibuprofen and lice shampoo, as well as an antibiotic cream for a cut on her hand. The records are attached as Exhibit 1. *See also* Tr. of Deposition of Rebecca Asch-Kendrick at 110-11. On January 8, 2020, JF was taken to the doctor with a cut on her knee, as well as headlice and impetigo. She was treated with Ibuprofen and an antibiotic cream for the cut. *Id.* at 106-07. The next month, she was brought back to the doctor again for head lice. *Id.* at 103. She was treated with Acetaminophen, Ibuprofen, and lice shampoo.

At the time of her death, JF presented with the same symptoms she had had in the past, which always resolved with Ibuprofen and lice shampoo. Julius tried to address JF's lice, but she refused to let him cut or wash her hair. Again, his failure to insist was negligent, but Julius did not recognize a risk of death.

JF was dangerously thin and suffering from malnutrition when she died. She had not gained appreciable weight since she was last seen by a doctor when she was four. But all of Julius's children were thin. Julius did not perceive JF as being malnourished. She became thin over time, gradually, in a way that Julius did not notice. She did not lose appreciable weight, but rather, as she grew taller, she did not put on weight. That was a gradual process that Julius did not notice.

None of the adults in the house had any idea that JF was in danger of dying. Facebook posts from Julius's mother, Sharon Rosebear, reflect that everyone in the house was shocked and mystified by her death. Various hypotheses were that JF died because one of the kids jumped on her while she was sleeping, she overdosed on drugs, had thin blood, or had something wrong with her blood. What no one said was, "she probably died of malnutrition," because no one perceived her thinness as an indication that she was in danger of death. The relevant posts are attached as Exhibit 2. No one in the house, including Julius perceived JF as at risk of death. Rather, they were negligent for failing to perceive the risk that existed.

It is also important to note CFS was monitoring the family following the neglect reports in October and December 2022. They did welfare checks on the family but completely failed to report any problems in the home, implement any repairs, or recommend any medical intervention. ¶ 23. *See* Tr. of Preliminary Hearing at 56-57 (March 31, 2023), Testimony of Special Agent Nicole Lopez (at time of JF's death, conditions in home had not improved despite involvement of CFS). Even after JF's death, CFS refused the FBI's request to intervene on behalf

of the other children for several months until the FBI "brought Family and Children Services with us [to the home], and they removed every person from the home together as a family unit." *Id.* at 57. According to CFS, despite several reports of neglect in the home, this case simply ""slipped through their cracks." *Id.* at 79. As Agent Lopez explained, "They were notified about the case and then they had not done anything for quite some time." *Id.* at 79.

Admittedly, the complete abdication of responsibility by CFS does not change Julius's own responsibility, a responsibility he has fully accepted with his guilty plea. Nonetheless, Julius's failure to act can only be understood in the context of the inaction by CFS. Julius had no reason to believe a medical intervention was necessary because the child welfare professionals did not recommend or require one. Julius should not be held to a higher standard than the agency charged with ensuring the welfare of children on the Reservation.

JF was seen by medical professionals as recently as 6 months before her death when she was brought in for a Covid shot. She received Covid vaccinations on January 25, 2022 and June 10, 2022, yet no one expressed concern about her weight. PSR ¶ 23.

The fact that no one ever warned Julius that JF was in serious danger reflects that he did not ignore a known risk. He failed to perceive a risk of which he was unaware. This is particularly important because Julius is not a proactive individual. He has never been good at taking initiative or doing things on his own. Most of his classes in school were special education classes until he dropped out of

high school in tenth grade. He did not try to complete his GED because he thought he would not be able to do it on his own. Giacomoni Report at 9. When he and Tessa Jones split up, he moved back in with his parents. He often looks to his parents to help him make decisions. Giacomoni Report at 7. He has virtually no employment history other than seasonal farm labor. He does not have a driver's license because he found the driver's manual too difficult to understand, and he failed the written test twice, after which he gave up. Giacamoni Report at 3 n. 1. In psychological testing, Julius was particularly weak in concept formation such as pattern recognition. Giacomoni Report at 12. Thus, data points that may have led someone else to conclude that JF needed medical attention may have been missed by Julius.

Dr. Giacomoni, who completed a psychological evaluation of Julius, noted four factors that could help explain Julius's failure to recognize JF's need for medical attention. (Dr. Giacomoni's report is attached as Exhibit 3.) First, Julius had little trust in medical institutions. He neglected his own health and felt that people looked down on him if he asked for help. Giacomoni Report at 17.

Second, Julius relied heavily on the decision-making of others. As Dr. Giacomoni noted, "Diffusion of Responsibility is a phenomenon by which people are less likely to take needed action when there are other people present, particularly if the others are similarly not taking action." *Id.* at 18. Seeing that no one else was taking action, Julius concluded that no action was necessary. *Id.* With respect to JF's death, Dr. Giacomoni stated, "As it related to [JF's] death, Mr. Fineday stated that neither his parents nor his brother expressed concern over her weight, and that

his brother did not appear concerned with her difficulty walking. In such, Mr. Fineday diffused responsibility for the assessment of the severity of these concerns onto others, rather than retaining such for himself." *Id.* at 18.

Third, Dr. Giacomoni noted that Julius had developed "Learned Helplessness," after repeated failures in life from which he felt "a reduced sense of efficacy in the world." *Id.* at 18. As a result, he was easily dissuaded from taking steps to address JF's lice or medical issues. *Id.* at 19.

Finally, Dr. Giacomoni reported that Julius struggled with "Concept Formation," the ability to put two and two together. *Id.* at 19. This impaired Julius's ability "to understand what is happening and how to respond appropriately," which only further increased his reliance on the opinions and actions of those around him. As Dr. Giacomoni concluded:

> As it relates to [JF], Mr. Fineday's difficulty with Concept Formation likely impacted his understanding of the importance of overruling her protestations and bringing her to the hospital even if she might be upset with him. In such, he appears to have had a reduced ability to contemplate in depth that tending to her medical care was more important than her protestations and refusals. Of more direct relevance, his difficulty with Concept Formation could have contributed to his statement that he did not know that she had an infection. That is, he did not recognize that open sores could become infected and monitor her for such. Similarly, when he observed [JF] having difficulty walking, he "was trying to figure out why she couldn't walk." Unfortunately, this observation did not adequately 'sound the alarm' that he needed to call the ambulance.

*Id.* at 20.

For all of those reasons, Julius did not perceive the threat to JF's welfare until it was too late. He missed the warning signs because he was unable to put two

and two together and he relied too heavily on the lack of concern of those around him. That was negligent. But because he was entirely unaware of the risk, he did not act recklessly. Julius loved his daughter. Had he understood her life was in danger he would have acted differently.

It is important to remember that whether a defendant's actions are reckless or only negligent does not depend on the seriousness of the risk. A defendant is not reckless for failing to recognize a risk of death, as opposed to a less serious risk. If the defendant is unaware of a risk that a reasonable person would have noticed, he is negligent regardless of the danger presented by the risk. "Recklessness does not require a more extreme derogation of the defendant's duty of care; both negligence and recklessness, under this section, constitute 'a gross deviation from the standard of care.'" *United States v. Alvarez*, No. 18-15084, at *17-20 (11th Cir. Apr. 7, 2020).

In *United States v. Gardenhire*, 784 F.3d 1277 (9th Cir. 2015), the Ninth Circuit considered whether the defendant had recklessly endangered an aircraft when he pointed a laser at it while in flight. Using the definition of recklessness from U.S.S.G. § 2A1.4, the court held that the government had failed to establish that the defendant was aware of the risk created by his offense conduct, even though the consequence of that risk could have been cataclysmic had the pilot been blinded or distracted "or the aircraft otherwise endangered." *Id.* at 1280-1281.

Similarly, here, although the risk to JF was great, because Julius Fineday was unaware of the risk, his conduct was negligent, rather than reckless.

## III. A sentence of a year and a day is sufficient but not greater than necessary to achieve the purposes of sentencing

In light of the foregoing discussion, the applicable guidelines can be calculated as follows under U.S.S.G. § 2A1.4:

| | |
|---|---|
| Base Offense Level | 12 (criminally negligent conduct); |
| § 3A1.1(b) | 2 (vulnerable victim) |
| § 3E1.1 | -2 (acceptance of responsibility) |
| Total Offense Level | 12 |

With a criminal history category of I, this results in a guideline range of 10-16 months. *See* Doc. No. 124 at 5-6.

These guidelines properly reflect the fact that little is served by severely punishing negligent conduct. Julius Fineday did not intend for his daughter to die. He did not intentionally deprive her of food or medical care. For reasons articulated by Dr. Giacomoni, he simply failed to appreciate the severity of her condition. No one regrets that fact more than Julius Fineday.

Although one might argue that punishment will encourage less negligence in the future, that proposition ignores the nature of negligence. Intentional or even reckless conduct can be deterred. But the very nature of negligence is the failure to appreciate the consequences of one's actions or failure to act. Simply stated, one cannot avoid risks he fails to recognize in the first place.

Julius Fineday is not an evil person. He tried his best to care for his children, but was unable to do so. It is unclear why JF failed to gain weight. Julius never intentionally deprived her of food or abused her in any way.

There is plenty of blame to go around. Red Lake Children and Family

Services was aware of neglect complaints concerning the children but failed to intervene. Even after JF died, CFS failed to remove the children from the home until this prosecution began. Only after her death were resources mobilized to repair the home in which she lived.

Tessa Jones, the mother of Julius's children, abandoned them entirely. Julius attempted to raise the children on his own, with his parents' help, and so he is the one responsible in the eyes of the law. It is a sad irony that Ms. Jones escaped criminal liability by abandoning her children, while Julius, who did his best to provide, is that one before the Court.

Julius has never shirked his responsibility. Although the government refused to make any plea offer, Julius nonetheless pleaded guilty with no assurance as to punishment other than a maximum penalty of 10 years.

This case is not well suited to the criminal justice system. The Red Lake community would have been better served had the resources that went into this prosecution instead been directed to bolstering social services on the Reservation. Had CFS gotten involved sooner, resources could have been provided to assist the family. The home could have been repaired. If deemed necessary, the children could have been removed from the home to ensure their safety was not compromised. Julius Fineday could have been offered parenting classes to help him to understand his role as caretaker. He might have learned that as a parent, he had to insist that his daughter cut and wash her hair, even if she kicked and screamed. He had to understand that if she was not gaining weight, medical intervention was required.

By contrast, the tools available to this Court are blunt instruments. It can send Mr. Fineday to prison but for what reason and at what cost? A short prison sentence is appropriate to reflect the seriousness of the offense, but anything beyond that fails to fully reflect the difference between negligence and intentionality.

Whatever sentence this Court imposes, Julius Fineday has already been severely punished. The death of his daughter, a death for which he holds himself responsible, is a horrible tragedy that no parent should have to experience. Julius knows that it was up to him to save his daughter, and he failed to do so. Julius loved his daughter. There is no question that had he ever realized she was at risk of death, he would have acted differently. Since her death, Julius has fallen into depression and has gained nearly two hundred pounds. PSR ¶¶ 43, 44.

## Conclusion

For the foregoing reasons, this Court should apply the involuntary manslaughter guideline, U.S.S.G. § 2A1.4, as the appropriate guideline, resulting in a guideline range of 10 to 16 months. A sentence of a year and a day is sufficient but not greater than necessary to reflect Julius Fineday's negligence which resulted in the tragic death of his daughter.

Dated: July 9, 2024

Respectfully submitted,

*s/ Robert D. Richman*
ROBERT D. RICHMAN
Attorney ID No. 226142

P.O. Box 16643
St. Louis Park, MN 55416
(651) 278-4987

Attorney for Defendant