UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-224(2) (PJS/LIB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. SHARON MARIE ROSEBEAR, Defendant. | ) ) ) ) ) ) ) | **SHARON ROSEBEAR'S POSITION ON SENTENCING** |

Sharon Rosebear was convicted of negligent acts constituting child abuse. It was not alleged and she was not convicted of intentionally abusing her granddaughter. She loves [redacted] very much and wishes more than anything that, with the benefit of hindsight, she could go back and undo much of the past few years. She understands that looking backward, this "ending" seems obvious. But as the situation was slowly unfolding in real time, there was much she did not realize. Again, her acts have at all times been alleged and deemed to be negligent, not intentional.

There are certainly reasons and explanations as to how Ms. Rosebear and her family arrived in this tragic position, and while those were heavily addressed at trial and touched on below, the truth is that these explanations provide little comfort to Ms. Rosebear in the wake of what's occurred. She is devastated by the loss of her granddaughter, and further grief-stricken by the loss of her other grandchildren. She has been worried sick about her son Julius' impending federal prison sentence. And being a partner to Phillip "Sausage"

Fineday for almost 45 years, she feels deeply depressed at the thought of what will happen to him if she receives a custodial sentence.

## I. A Probationary Sentence is the Right Sentence For Sharon Rosebear Based on 3553(a) Considerations of Punishment, Specific Deterrence, and General Deterrence

Sharon Rosebear's current reality is sufficiently punitive such that a custodial sentence is not needed to further punish her for her negligent acts. She has lost custody of all of her grandchildren and soon after being placed in foster care, one of her granddaughters was sexually abused, something Sharon hoped to always shield them from. She has watched her son, Julius, be federally prosecuted, convicted, and sentenced. She will have to watch him leave her home to go serve a five-year prison sentence, something he has never done before. She has been vilified by her community, and heard for more than two years, people saying unimaginably cruel things about her family. Most importantly, she lost [redacted]. The loss she feels is ever present. The Court can be sure that Sharon has been and will continue to be sufficiently punished every single day.

Sharon Rosebear has been deterred. She is a 64-year-old woman, with no criminal history, who is not and likely will never again be a caretaker to minors. A custodial sentence is not necessary to specifically deter her in the future. To the government's credit, they seemed to acknowledge as much even as to Julius Fineday, the more culpable of the two. They acknowledged that as family members, their expressions of devastation at [redacted] loss are legitimate and significant, and a prison sentence is not needed to promote specific deterrence.

The government will likely argue then that a custodial sentence is necessary to provide general deterrence to the Red Lake community. While that may have been the case for Julius Fineday, [redacted] father—who had the best chance to save his daughter not only because he was most intimately connected to her care, but because he was also with her during her last two days when she most desperately needed medical attention—it is not the case for Ms. Rosebear. If the government intended to send a message to the Red Lake community that even non-legal custodians, non-parents, are required to take action in such situations or else risk being prosecuted for their failure to act, then all of the adults who failed to act on [redacted] behalf should have been prosecuted.

In the case at hand, Phillip Fineday, Derrick Rosebear, Salina Kingbird, and [redacted] own mother, occupied the same role as Ms. Rosebear. They had knowledge of [redacted] condition, had the ability to pick up the phone and call authorities to report Julius and/or Ms. Rosebear, could have taken [redacted] one mile down the road to the EMS station for help, they all knew [redacted] was school-aged and could have enrolled her in school, had access to the Reservation's free medical care, and could have used their supposed "pooled" benefits to provide food for her. None of the four did that.

As a result, the message to prospective caretakers in the Red Lake community is: if you fail to address a child's severe headlice, malnutrition, or acute illness, maybe you will be held accountable but maybe you won't be. Four of the five people who committed this offense were not prosecuted, even though, as shown in our Rule 29 motion, the Government had entered all of the necessary evidence to prove the charge against Phillip Fineday and Derrick Rosebear. Because the Government's own prosecution decisions,

believe a message of general deterrence, a custodial sentence (on these facts and as to Ms. Rosebear) does little to provide general deterrence. The 3553(a) considerations of just punishment, specific and general deterrence weigh against a carceral sentence.

## II. A Sentence of Probation is the Right Sentence Based on the Offense Conduct

Having presided over Ms. Rosebear's trial, the Court is intimately aware of the facts of this case. The Court heard and saw evidence related to the dire condition of the home, the limited financial means of the Rosebear/Fineday family, especially when divided by 15-18 people, and their struggles with trying to rid the home of lice when they had no running water but continually received shampoo in response to their lice problem. The Court also heard about Ms. Rosebear's debilitating physical conditions (expanded on below), which limited her physical capabilities.

While parties may see some of the facts and issues in this case from different angles, one thing the parties do agree upon is that the facts of this case are extremely sad. It is safe to say that it is no one's position that the death of Ms. Rosebear's granddaughter was intentional or the desired outcome. The government noted at Julius Fineday's sentencing that a sentence aimed at specific deterrence was not necessary since he had "suffered" enough at his daughter's passing. The same is true of Ms. Rosebear. She is heartbroken by the loss of her granddaughter. While much argument can be made about what she should have known and what she should have done, counsel hopes it goes without saying that she never wanted this. A handful of fleeting moments of frustration memorialized by internet posts cannot and should not be presumed to be the depth of the relationship Ms. Rosebear

shared with her granddaughter. Ms. Rosebear loved [redacted] and those closest to Sharon have heard her discuss deep feelings of depression since her passing.

## III. Ms. Rosebear Has Complied with All Conditions of Pretrial Release

Perhaps unsurprisingly considering her lack of criminal history, Ms. Rosebear has complied with all aspects of pretrial release since her release in March 2023. Her conditions required, *inter alia*, that she get a mental health evaluation, submit to chemical testing, and comply with various conditions related to continued visitation with her grandchildren. She has followed all of these directives. In addition, she has participated in ongoing therapy to address the loss of her granddaughter, grandchildren, and other unaddressed traumas she's endured throughout her life. She has incurred no violations of any kind during the past 19 months. Pretrial release is an important indicator of how seriously they take their case, how remorseful they are and how they will do in the community going forward. Her compliance with pretrial release weighs in favor of a probationary sentence.

## IV. Background and Characteristics of Sharon Rosebear

Sharon Rosebear was born in October 1960, the sixth of seven children in her family. Her father was an engineer for the State of Minnesota and her mother worked various jobs, always the night shift. Even though her mom worked nights, Sharon's father would regularly stay out all night drinking and, as Sharon puts it, "God knows what else". Without either parent there, the children were left to care for themselves and on one of these occasions, at the age of five, Sharon and her sister were molested. She never told her parents. Years later, the perpetrator went on to become a police officer on the Red Lake Reservation.

Sharon describes her father as a very mean person. He had anger issues and used everyone's failure to follow the strict household rules he implemented as reason to hit them. The only person in the home that was spared from his abuse was Sharon's younger sister. Because of the severity of these regular beatings, each child left the home at the first opportunity, as soon as they were old enough. With her older siblings gone and her youngest sister exempted from the violence, Sharon became the focal point for her father's abuse. And it wasn't just physical. Her father also inflicted mental and emotional abuse on young Sharon. It was only more recently that she realized she spent most of her life believing she was "stupid", "dumb", and "worthless". There were several times during her childhood that Sharon ran away because she was completely overwhelmed by her father's physical, emotional, and verbal abuse.

Unfortunately for Sharon and her siblings, their mother was in no position to help them. She was a victim of her husband's abuse too. And she had been and continued to be suicidal, something Sharon did not discover until her father died, when Sharon was 16 years old. Following his death, the family did not know how to adjust from the strict rules and abuse. Sharon's mother pulled away and completely stopped caring for the children. That responsibility fell on Sharon.

Life outside the home was also hard on Sharon Rosebear. Growing up, Sharon's family was the only Indigenous family in their white, Minneapolis neighborhood. She struggled to make friends, and even when she did, she soon experienced being turned away from their homes when she showed up for play dates and birthdays. She realized it was

because she was Native. Sharon recalls that she eventually met "one Black girl and one Mexican girl", and those were her two friends growing up.

By her senior year of high school, Sharon began dating a man named Roland Anderson. He beat her violently throughout their time together, and it was just the first of several physically abusive relationships she would be in. Sharon remembers that as an adult someone explained her pattern saying that she was dating men who were like her father. With hindsight, she agrees she was repeating that relationship over and over. Sharon became pregnant with Roland's child, and after a particularly violent assault, she was taken to the hospital to undergo an emergency C-section. Wayne was born two months prematurely and weighed just 3.9 pounds. Still a senior in high school, Sharon would go to school with Wayne, as allowed by school, but ultimately had to drop out because Wayne simply had too many medical issues to be allowed at the school. Sharon made it a point to earn her GED on her own.

Sharon and Roland stayed together after the birth of their son and life was predictably chaotic. He cheated on her countless times. When she confronted him about it, he would hit her. Still in her late teens, it took her some time to gather the strength to leave him. There were times she got restraining orders, but he'd violate them, and police would do nothing when she called to report him. She remembers fleeing the home with Wayne only to end up in homeless shelters with a sickly son. She struggled to end the relationship because she kept hoping Roland would change and that they could be a family. She eventually did end it though. Wayne is currently incarcerated, nevertheless she has regular contact with her son and does her best to put money on his books when she can.

At age 20, Sharon met Phillip (Sausage). He too physically abused Sharon for years. His beatings left her with bruises on her face, busted and swollen lips, and serious injuries to her jaw. The assaults continued throughout her pregnancies, which sometimes were so severe that she ended up being taken to the emergency room. This cycle continued until Sharon was 35 years old. She and Phillip had three more sons together and have 27 grandchildren total. They have seen countless ups and downs, and endured significant loss over the course of their lives. Phillip has had four heart attacks and eight stents, and his heart is functioning at 15%. Sharon continues to be there for Phillip despite their complicated history.

Whatever the Court has seen from Ms. Rosebear on the outside, those closest to her know that her heart was completely broken by [redacted] passing, and overwhelmed with regret over all that has happened. The additional loss of her other grandchildren has been almost too much to bear. There have been many family members in Sharon's life that she wishes would have made different life choices, but even so, Sharon has never turned family away when they needed her. Like everyone, Sharon is not perfect. But unlike many people, Sharon has always tried to be better to her loved ones, than most of her loved ones have been to her.

## V. Sharon Rosebear Has Significant Health Issues

Ms. Rosebear has had a difficult life and her body bears proof of that. She suffers from many chronic health problems. At the age of 20 (1980), Ms. Rosebear was diagnosed with scoliosis, which means that she has an irregular curve of the spine (making the spine appear to form a S- or C-shape). She takes three medications to treat her scoliosis. This

condition progresses over time, progresses faster in women than in men, and often leads to back problems later in life. This was the case for Ms. Rosebear and 37 years later, at age 57 (2017), Ms. Rosebear finally underwent back surgery. This was recommended due to both her scoliosis and diagnosis of degenerative bone disease. The surgery results in spinal fusion, which means that several of her vertebrae were fused together and can no longer move independently. The fusion occurred but the surgery was botched and her sciatic nerve was damaged. Ms. Rosebear is in constant pain, which runs from her lower back down her leg. In addition to pain, she also experiences weakness, numbness and tingling at times. Doctors have not focused on treating the core issue but instead have her coming in to receive medication injections four times a year to manage the pain. At one of these appointments in 2023, and due to her limited mobility, Ms. Rosebear fell off the examination table, sustaining injury to both her neck and left shoulder. This has limited her movement even further. She must lay down now in order to do tasks which involve lifting her arms above her shoulders. She needs two surgeries now: her right shoulder needs to be replaced entirely, and her left shoulder needs rotator cuff surgery. She also uses medication to manage hyperlipidemia, diabetes, and hypertension. She had a heart attack in 2014 and had two stents implanted. She has since had episodes that feel like heart attacks and has been told she needs to see a vascular surgeon to address the constant swelling and cold sensation in her legs, as that is indicative of vascular problems. Many of these conditions have compounded, and she requires assistance to walk and get around. She uses a walker, or when Phillip is using it, a walking stick. Even then, she moves slowly and that is getting worse. A sentence of any length will mean that Ms. Rosebear will experience a disruption

in the continuity of her care. It will also mean that given her complex medical conditions any custodial sentence will see her designated to the only women's BOP medical center in Texas.

## VI. A Probationary Sentence is the Right Sentence Under the Governing Law

In any case in the State of Minnesota where the defendant has the same severity level and same criminal history points as Sharon Rosebear, the presumptive guideline sentence would be 18 months of probation. An upward departure from that presumptive sentence would only be permissible if the jury found beyond a reasonable doubt that there were reasons to depart. Because federal law directs federal courts in these situations to pronounce "like punishment"—and because the jury did not make the findings necessary to allow for an upward departure—the Court should impose a sentence of 18 months of probation.

### The Court Should Impose A Probationary Sentence In Conformity With The Presumptive Minnesota Sentencing Guideline, As There is No Applicable Federal Sentencing Guideline

The presentence report has correctly concluded that there is no federal sentencing guideline that is applicable to this case. (ECF No. 192 at ¶25). The lack of a federal sentencing guideline is due to the fact that Ms. Rosebear was charged with an assimilative crime under the Major Crimes Act. Said another way, she was convicted of a state crime that happened to be prosecuted in federal court. In a case like this, where the Government elects to charge a State crime within an area of Federal jurisdiction and Congress has not expressed "a specific and contrary policy", the person is "subject to a like punishment" as

if the person was convicted in State court. 18 U.S.C. §13(a); *United States v. Christie*, 717 F3d. 1156, 1172 (10th Cir. 2013).

In *United States v. Christie*, 717 F3d. 1156, 1172 (10th Cir. 2013), then *Judge* Neil Gorsuch, in determining an appropriate sentence for a state conviction without an analogous federal sentencing guideline explained, when "the only congressional direction we have is the... general command to impose only 'like punishment'..., in the absence of any more specific direction, that command must be respected." *Id.* Justice Gorsuch then instructed, "In this way the statute plays an important role not just at trial but at sentencing, requiring federal courts 'to provide a method of punishing a crime committed on government reservations *in the way* and *to the extent* that it would have been punishable if committed within the surrounding jurisdiction.' *United States v. Sain*, 795 F.2d 888, 890 (10th Cir. 1986) (emphasis added)." *Id. at 1171.*

From 2018 to 2022, 14 people were sentenced for child neglect/endangerment under Minn.Stat. §609.378, subd. 1(a)(1). Of those 14 people, 13 had presumptive stayed sentences. The other person had a sentencing guideline calculation that resulted in a presumptive term of imprisonment (due to their criminal history) and after receiving a downward dispositional departure, even they received a probationary sentence. (Exhibit 1).

In this case, because no federal sentencing guideline is applicable to the offenses of conviction the applicable state guideline must be followed. Following the applicable Minnesota state sentencing guideline also ensures conformity with 18 U.S.C. § 3553 directive "to avoid unwarranted sentence disparities among defendants with similar records

who have been found guilty of similar conduct." Under Minnesota sentencing guidelines Minnesota Statute section 609.378, subd. 1(a)(1) is a severity level 5.[1] When paired with Ms. Rosebear's criminal history of 0, the resulting recommended sentence is a presumptive stayed sentence of 18 months of probation.[2] "Under Minnesota's determinate sentencing guidelines scheme, the judge must impose a presumptively stayed sentence unless substantial and compelling circumstances are present." *State v. Allen*, 706 N.W.2d 40, 45 (Minn. 2005).

**The Jury Did Not Make the Findings Necessary to Allow for an Upward Departure**

The Minnesota Supreme Court's instruction in *State v. Allen*, followed the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *See also State v. Shattuck*, 704 N.W.2d 131 (Minn. 2005). In *State v. Allen* and *State v. Shattuck* the Minnesota Supreme Court addressed the *Apprendi* requirements in relation to Minnesota's sentencing guidelines. In *Shattuck*, the Minnesota Supreme Court found that "an upward durational departure from the presumptive sentence prescribed by the Minnesota Sentencing Guidelines, based solely on facts found by the judge, violates the Sixth Amendment right to trial by jury…" *Allen*, 706 N.W.2d at 42. In *Allen*, the Minnesota Supreme Court confirmed the same requirement for the imposition of an upward dispositional departure executing the presumptive stayed sentence under the guidelines. *Id.*

[1] 2024 Minnesota Sentencing Guidelines & Commentary (mn.gov) at p. 114.
[2] 2024 Standard Grid 4A Minnesota Sentencing Guidelines & Commentary (mn.gov)

As a result of the *Allen* and *Shattuck* cases the Minnesota Rules of Criminal Procedure require the State of Minnesota to give notice if the State intends to seek an aggravated sentence. *See* Minn.R.Crim.P. 7.03, 11.04, and 19.04. Once that notice is given, the court must do two things: first, determine whether the proffered evidence could even support an aggravated sentence and, second, decide whether the evidence will be submitted pursuant to a unitary or bifurcated trial. Minn.R.Crim.P. 11.04, Subd. 2.

Because the Government failed to provide notice of an aggravated sentence, the Court was unable to make either determination. Furthermore, without such notice, the defense did not have an adequate opportunity to defend against the upward departure by either eliciting appropriate testimony, doing appropriate investigation, or calling witnesses to challenge the possibility of an upward departure. Finally, and significantly, the Jury was not asked to determine whether the evidence called for an upward departure.

If Ms. Rosebear had been found guilty of the same count of conviction just a few miles away, in state court in Beltrami County, Minnesota, she would be given the same presumptive guideline sentence as anyone else: eighteen months of probation. Because there is nothing in the federal sentencing scheme that requires something different, and because the governing state law process required to depart upward was not followed, any departure from that presumptive probationary sentence merely because of her status as a Native American would constitute an unwarranted sentencing disparity as well as a violation of Ms. Rosebear's rights guaranteed by the Due Process Clause.

## VII. Conclusion

The requested 18-month probationary sentence satisfies the mandates of state due process and state sentencing guidelines. It also satisfies the 3553(a) federal sentencing considerations. The right sentence for Sharon Rosebear is probation.

Dated: September 24, 2024.

Respectfully submitted,

*s/ Lisa M. Lopez*

LISA M. LOPEZ
Attorney ID No. 395791
AARON J. MORRISON
Attorney ID No. 341241
Attorneys for Ms. Rosebear
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415